Good morning, Your Honor. It's Kevin Bollet for the petitioner in this case. Your Honor, I'm going to use the term deportation. I know that the new law uses the removal word, but I'll use the word deportation in this case. And this is not a case, Your Honor, where the alien did not appear for his hearing because he was afraid of being deported. That would have happened on August 15, 2000, the first time that the petitioner was required to appear and, in fact, when he was ordered deported. Counsel, let me ask you a couple questions about that. Yes, sir. I know he tried to appear, but he couldn't get into the building because he didn't have an I.D. Correct, Your Honor. Now, most people carry I.D.s all the time. Yes. So if you were writing notice, you wouldn't think of telling people, be sure to carry a picture I.D. They don't tell you that when you get your plane ticket, I don't think. And this fellow, he had lots of I.D.s. He had one for Jose Gutierrez. As I remember, he had a whole bunch of I.D.s. I think you're looking at maybe the sheriff's record. Yes. You were looking at the different aliases. I guess as many of these former legalization cases are, Your Honor, many times these aliens used aliases or other names. But I don't think that means he had an I.D. card or a photo I.D. And remember that at the record page 48, the new immigration court hearing notices do have in capital letters an advisal that the alien must bring photo identification to enter the building. So this is not a notice case. This is not a case where he did not appear, nor is it a case where the alien did not appear because he arrived late. He tried to appear. Yes, sir. As I remember, he showed up at 1 sharp, his time of the hearing, downstairs. Yes, sir. I would think that he would have showed up at about 10 of 1 and said, oh, my gosh, can you call my lawyer and cell phone? And the lawyer could have come down and tried to straighten it out. Well, actually, I was the attorney. I was in the federal building already. I was at the hearing. And you were there. Well, actually, as I pointed out, I think, not so much in the case of this court, but to the immigration court, there is no telephone number on the hearing notice. They couldn't have called the court. And because I was in court, I couldn't have taken a phone call anyway. Is there any evidence that there was a phone there that he could call up to the courtroom? Well, Your Honor, this is the federal building in San Diego. It's a very large building. I mean at the security screening. There's no evidence one way or the other on that. It certainly would have been a good idea, but as perhaps people in this room have some experience, oftentimes when you have a long line waiting to get to a building, at that time, that was the headquarters for the INS in San Diego and a huge line. I would have thought he'd call on a cell phone. And the ladies have to turn theirs off, but the men can set them to vibrate. I don't know. Did he have a cell phone? Was there any evidence that he had a cell phone? No, sir, no evidence. But I will tell you, Your Honor, that many times these aliens are not the – although more and more so, but this is back in the year 2000 and – Oh, 2000. 2002, I'm sorry. And so it still is not – So he might not have had one yet. No, he certainly didn't. Now, Singh, the case that's closest to yours. Yes, sir. In that one, it struck me there's a real difference. Singh would have won his case if he had just shown up. All he was looking for was an adjustment of status because he was married to an American woman, and he really was married to a citizen American. Yes, sir. Your fellow, it wasn't just a matter of showing up. He really had to win. Well, Your Honor, I mean, all relief from removal. Mr. Singh was also in the country illegally because I believe his – I believe that his status had expired. He was an overstay. He hadn't snuck in. He'd married an American. I think the court said he'd win if he'd shown up. But it's still – I mean, all relief is discretionary. In the discretion of the Attorney General, he may grant adjustment of status. I mean, there could have been some negative factors. We don't – I don't know. Maybe he would have come out at the merits hearing. But the thing is that the Singh's case is a published decision, so when the panel published it, it wasn't just, well, this is going to be a sweet, generous case, and only for Fritjof Singh. You understand. I'm asking you, should we distinguish Singh? Because your Singh, all he had to do was show up and he wins, according to the published decision, whether that's an adequate representation of the facts or whether it could have been expanded. Your fellow, it's pretty clear that discretion really was going to have to be exercised and it could go either way. That's true, but, Your Honor. Yes. Well, first of all, he was – he wasn't eligible for 212C relief at the first hearing. That's why he was deported. Then the case went up. The St. Cyr case was decided by the U.S. Supreme Court. That made him eligible for 212C relief. The government had joined in the motion to grant that relief. I think they had to do that under the regulations. But more importantly, the St. Cyr case spoke of how liberally that relief was granted. And I'm sure some of the judges on this panel or in this Court would remember those days when the 212C relief was granted very liberally. And I think you also – the Court should also distinguish, Sing, because if removal or deportation was unconscionable in Sing, it is even more unconscionable in this case. And don't forget, Sing gave us a test relying on the particularized facts. The Petitioner in this case had never failed to appear as Sing. I appeared. I was there ready to go, waiting down in the courtroom. I went to do the case. He was eligible for 212C. He had been an LPR, a lawful permanent resident, since 1990. That's now 16 years. And Sing didn't have any status, just a visitor. And this Petitioner has a 9-year-old daughter. And more importantly – If I recall correctly in Sing, the Petitioner in Sing just didn't show up at all. Isn't that right? Correct, Your Honor. And then the question comes back, were there exceptional circumstances that would excuse his failure to appear? Yes, sir. Seems to me that's – Sing is distinguishable in the sense that we don't even get to Sing if your guy really did fail to appear at all. I mean, say, for example, he showed up and the doors were locked. That's true. I was going to say, Your Honor, it's like almost like – and the government perhaps correctly or technically says that the notice was not defective. And that's true. But it also – but it may have been deficient in that it did not advise the Petitioner of the absolute necessity of bringing the I.D. And it's kind of like going to – it's kind of like someone – it's kind of like giving somebody the date, time and place of the hearing without telling them that they need to bring a ladder because it's going to be on the second floor and the doors are closed that day. So – and I think even if the Court is unwilling to find that the notice was defective – The thing – Sing is distinguishable in both directions as you've pointed out. The thing about it is your fellow has been committed – convicted of an aggravated felony and of a crime of violence and Sing hadn't been. Yes, Your Honor, but that was in 1991. In 1991. So what? Usually I would interpret that as meaning in 1991 or as soon as he got out of jail, whichever came first, he should have been gone. And the funny thing is, Your Honor, at that time there was no – the aggravated felony definition wasn't even – that wasn't even as strict as it is today because that all came from the new amendments. And so – But isn't one of the concerns that Judge Kleinfeld is raising is, though, that the government, the INS, agreed that he could go in and make his pitch? Yes, sir. Right? There was a joint stipulation that he could make his 212C relief pitch. True, Your Honor. Although I do – to be fair to the government, I'm not saying that the government would have – they never agreed that the alial would win in the merits. No. I understand. Right. They agreed that he should have his day in court on this. Yes, sir. But, again, the St. Cyr case tells us that that relief was liberally granted. And the fact that this Petitioner has no further criminal record I think will – I mean, I would argue, certainly, that this is the type of case that probably would have been granted, given his long-term status, U.S. citizen child, stable work history. If you win, do we remand so you can make your 212C pitch? Correct. Yes, Your Honor. Go back to the immigration judge. He brings his I.D. this time. He goes into the courtroom, and then he'll show the equities. The judge will balance the negative and favorable, and hopefully he'll be granted 212C relief and remain a lawful permanent resident. Thank you. Thank you, counsel. Yes, Your Honor. Counsel. Good morning, Your Honors. I'm Melanie Schender, representing the United States Attorney General and the Secretary of the Department of Homeland Security. Your Honors, this case turns on whether the Board of Immigration Appeals abused its discretion when it affirmed the immigration judge's denial. We're both obviously troubled by the same thing. He really did show up, so why not let him make his 212C pitch? Your Honor, the answer to that question is the fact that Mr. Martinez-Polito did not show up at immigration court. He alleges that he appeared at the doors to the Federal building, but he did not have his identification with him. What told him that he was required to have identification? Well, Your Honor, it's not clear from the record what exactly told him that he needed identification. However, he never alleges he didn't know of the requirement. That is glaringly obvious. That's pretty obvious from the circumstances, isn't it? He shows up there and he doesn't have it. He's there to appear, and they won't let him in the building. Your Honor, respectfully, in his declaration at page 34 of the excerpts of the record, he simply states that he presented himself at the Federal building and that because these new requirements were in effect, he was not admitted. However he was not admitted. Okay. If you say he had some burden to show he was supposed to indicate that he knew he was supposed to have it or didn't know he was supposed to have it, I would suggest that the burden is on you to show that he was somehow informed that he was required to have it. Why isn't that your burden? Your Honor, the burden always rests with the alien to establish that the exceptional circumstance exists. Okay. Could he look up in a regulation somewhere in CFRs someplace and find out, gee, you have to bring ID to the building to get in? Your Honor, those requirements would not be present in the regulations. Okay. So they're not published anywhere. They're not on the notice. How would you suggest that he was supposed to know he was supposed to bring ID? Through a conversation with his counsel, Your Honor. Through word of mouth, just kind of word of mouth. Certainly, Your Honor, attorneys advise their clients of certain requirements of courthouses on a daily basis. Suppose we said today to get into our building you needed to bring a passport, and we just decided yesterday that we're going to have passport day today, and we didn't let you in. Do you think we could do that? Well, Your Honor. Give you no notice of that? It's not published anywhere. It's not in your, you know, the clerk didn't tell you? If the clerk didn't inform, which, respectfully, I would submit the court would, the clerk would most likely call every attorney who needed to appear. Yeah, and if they didn't do that because the clerk didn't call Mr. Martinez, but, I mean, if the clerk, if we just said, okay, Thursday in Pasadena it's going to be passport day. To get into the building you need to show a passport. And here comes Ms. Schender who doesn't have her passport. Can we turn you away, do you think, and proceed, treat you as though you failed to appear in court? Your Honor, I submit on those facts that that would be potentially a reason to reopen. However, here the requirement had been in effect for at least ten months. Why didn't we cut the guy some slack? I mean, if he really made a good-faith try, he didn't violate anything, and we have no reason to doubt that he showed up at the federal building, they wouldn't let him in, and he said, I have court at ten, or at one. But the guard says, tough, you have to have an I.D. Why shouldn't we just cut him some slack? Even if they did have the power, I don't know that we have to say they didn't have the power to require I.D.s. But why not give him a break and let him make his 212C pitch, because he did everything he could to get there? Well, Your Honor, the — this Court noted in, I believe it was in the Sharma case, that the immigration authorities have a very heavy interest in ensuring that people show up for their hearings. There are a lot of us who've — there are so many immigrants in America, a lot of us have had informal contacts and a lot of us hear about all kinds of arbitrary things. My son was once helping somebody renew her H-1B, and they were in a room, and some poor guy didn't have exact change to pay the fee. And he was desperate, and they wouldn't make change. He'd done everything. So my kid gave him five bucks so that he'd have the exact change. I don't understand. Why not cut people a little slack for that? Well, Your Honor, in this case, it's — the issue is whether the BIA's decision was arbitrary or rational or contrary to law. And that does not — It seems arbitrary. I mean, not to give people a break when they've done everything in good faith to do what they're supposed to do. And then they can't because of a requirement they didn't know about. Well, Your Honor, respectfully, again, the record here does not reflect that Mr. Martinez-Polito did not know of the identification requirement. And as you expressed earlier, this case — Oh, that's how I read his declaration. If I'm misreading it, educate me, because that's what I thought he was saying. Your Honor, he very carefully did not state anything about his knowledge of the requirements. Indeed, even in the opening brief, his counsel did not state he did not know, other than making a statement that the record reflected he did not know. The arguments all go to he had no way of knowing. I'm going to use a phrase that were not in effect the last time I appeared as meaning it was new to me. But I guess you're right. It doesn't exactly say so. I agree, Your Honor. I don't understand how we can charge him with knowledge of a requirement that's not published, it's not sent to him, it's not lookupable. You know, normally, ignorance of the law is not an excuse because you can go look up the law. Under your theory, he's just supposed to kind of catch it from the air that he's supposed to bring ID that they've started this new requirement. Your Honor, the requirement is posted outside the federal building. Okay, but by that time when he's shown up, that's when he finds out about it for the first time. What kind of notice is that? As you pointed out, he showed up promptly at 1 p.m. Had he shown up early to ensure his timely interest in the courthouse, which is located in the basement of the federal building, then he would have had time to contact his attorney and make efforts to get in touch with his attorney. How would you propose he do that? Well, Your Honor, by a telephone call to his attorney, to his attorney's office, who could then start searching for him. Another question is why his attorney did not request a continuance to step outside and use his cell phone. Do you have a cell phone? Yes, Your Honor. Is it on here in the courtroom? No, it's not. So if someone needed to call you in the courtroom, what would they do? They would leave a message. And you'd get it after the proceeding is over? Yes, Your Honor, unless I requested a continuance so that I could contact my client. Then I could step outside and hopefully. It would have been nice to know if he had a cell phone. I know the ladies usually have to turn them off because the ring would disrupt courtroom proceedings, but the men can set them to vibrate so that they can just ignore them in their coat pocket. There's nothing in the record to show whether there were cell phones available to these people, is there? No, Your Honor, the record does not reflect that he has a cell phone. However, this is a business district in San Diego, and there certainly are pay phones available. So it's not clear that a cell phone would be required to establish that he had a means of contacting his attorney. Turning to the Singh issue, as you mentioned, Mr. Singh had not been convicted of any criminal offenses. And also in another point, Mr. Singh was never in custody. Opposing counsel has made the point that Mr. Martinez-Polito appeared for all previous court hearings. However, most of those court hearings he was in custody, so he had no choice but to appear. In another point, Mr. Martinez-Polito didn't initiate the proceedings. Why not just let him go for his 212C? It looks like a loser. Your Honor, if we reopen every case just to let people apply for a relief that's unmerited, the immigration courts would be desperate. Why did you stipulate to have him reopen his 212C? The regulations required it, Your Honor. Well, then shouldn't he get the benefit of that? He did receive the benefit of that, Your Honor. He had his case reopened, and then he failed to take advantage of that benefit by failing to appear for court. By getting to the merits, if it's as my guess is, to eliminate the risk of some bad law. The – I'm sorry, the merits of the 212C? The 212C. Your Honor, if this Court were to find in favor of reopening, that does not – would not state anything as to the merits of his case. It would simply be a finding as to whether he had established exceptional circumstances. I don't think I made myself clear. My guess is, and I don't know this, that there are two ways to say no to this fellow. One is, I showed up at the downstairs door, but you never made it to the courtroom, so you lose. And the other is, we'll reopen, we'll hear your case, you're an aggravated felon. We're not going to give you 212C relief. That's mostly for people who've been a good citizen in every way, except they weren't good citizens. They weren't citizens. Your Honor, I see that my time is up. May I? Is there a reason – go ahead and answer. Is there a reason – Why is it important to hold on to the failure to appear position for denying relief in this case, in the case of somebody who really did show up at the courthouse and tried to get in? Your Honor, it's important that this case not be an exceptional circumstance, because allowing it to be so would be to excuse aliens from things such as, well, I couldn't find parking. No, that's not true at all. We already have cases that say bad traffic and can't find parking are not excuses. That's a whole different story than when you show up at the door and they turn you away, isn't it? You don't see the distinction between showing up and having them send you away and not allowing enough time to find a parking space? Yes, Your Honor, I recognize that distinction. However, the issue here is that Mr. Martinez-Polito did not include the details which would establish the fact he did not have his identification was beyond his control. He didn't allege that he had been mugged, for instance, on the street the night before and had no way of obtaining his identification. And he didn't include any information suggesting that his identification was unavailable to him. Thank you, Your Honor. Thank you, Mr. Schindler. I'm sorry, Mr. Schindler? You have a few seconds. Just to reemphasize that I don't think it's a lose-your-case, Your Honor, because the St. Cyr case reminded everyone that these were granted very liberally. In fact, drug traffickers, aliens, muggers, people who are no longer eligible, and even child molesters, God forbid. And so I don't think it's a lose-your-case. And also to the extent that we let them all in? No, sir. No. But this case is one where he would be eligible, and it's one mistake, and otherwise it's a record. And with respect, there is a footnote in the brief, government's brief about ineffective assistance or failure of communication, but how far is the government prepared to take that argument that I'm to blame or the attorney's to blame for not telling the client? I mean, why not have the attorney give all the advisals, change of address, consequences of failure to appear? Why give written notice at all? Why don't you just call me and say, hey, tell your client to be here on that day? And also, there is no evidence, really, on that issue because, for example, on what date were the security measures implemented? When was the attorney notified of the change of requirements? How many times had the attorney entered in the building after there were new requirements? And so that's why, Your Honor, I would ask the Court to please grant the petition. Thank you. Thank you, counsel. Thank you, Mr. Schender. Martinez-Polito v. Chertoff is submitted. We'll hear Vardanyan v. Gonzales.
judges: Lay, Kleinfeld, Silverman